699 F.2d 1209
 226 U.S.App.D.C. 57
 ACTION ON SMOKING AND HEALTH, Petitioner,
v.
CIVIL AERONAUTICS BOARD, Respondent.
ACTION ON SMOKING AND HEALTH, Petitioner,
v.
CIVIL AERONAUTICS BOARD, Respondent.
ACTION ON SMOKING AND HEALTH, Petitioner,
v.
CIVIL AERONAUTICS BOARD, Respondent.
ACTION ON SMOKING AND HEALTH, Petitioner,
v.
CIVIL AERONAUTICS BOARD, Respondent
Air Transport Association of America, Transamerica Airlines,
Inc., Intervenors.
 Nos. 79-1044, 79-1095, 79-1754 and 81-2023.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 20, 1982.
Decided Jan. 28, 1983.
 
 Petition for Review of an Order of the Civil Aeronautics board.
 John F. Banzhaf, III, Washington, D.C., with whom Paul N. Pfeiffer and Athena Mueller, Washington, D.C., were on the brief, for petitioner in 79-1044, 79-1095, 79-1754 and 81-2023. Peter N. Georgiades, Pittsburgh, Pa., also entered an appearance for petitioner, in 79-1044 and 79-1095.
 Kathleen O. Argiropoulos, Washington, D.C., for intervenor, Air Transport Association of America in 81-2083.
 Walter D. Hansen, Washington, D.C., for intervenor, Transamerica Airlines, Inc., in 81-2023. Jeffrey A. Manley, Washington, D.C., also entered an appearance for intervenor, Transamerica Airlines, Inc.
 Mark Frisbie, Attorney, C.A.B., Washington, D.C., with whom Ivars V. Mellups, Deputy Gen. Counsel, Thomas L. Ray, Acting Associate Gen. Counsel, C.A.B., Barry Grossman and Mark Del Bianco, Attorneys, Dept. of Justice were on the brief, for respondent. Glen M. Bendixsen, Barbara Thorson, Gary J. Edles and Michael Schopf, Attorneys, C.A.B., Margaret G. Halpern, John J. Powers, III, and Robert B. Nicholson, Attorneys, Dept. of Justice, Washington, D.C., also entered appearances for respondents.
 Before WRIGHT and MIKVA, Circuit Judges and BAZELON, Senior Circuit Judge.
 Opinion for the Court filed by Senior Circuit Judge BAZELON.
 BAZELON, Senior Circuit Judge:
 
 
 1
 Petitioner, Action on Smoking and Health (ASH), challenges the promulgation of Regulation ER-1245 by the Civil Aeronautics Board (Board). That regulation relaxes prior protections afforded nonsmokers against breathing the tobacco smoke of fellow passengers aboard aircraft. The Air Transport Association of America and Transamerica Airlines, Inc. have intervened to argue that the Board is altogether lacking in authority to regulate smoking. We find that the Board does have such authority, but the Board's failure to address adequately certain relevant matters requires us to vacate its action in part and remand it in part.
 
 I. BACKGROUND
 
 2
 The Civil Aeronautics Board has regulated smoking on airlines since 1973.[1] It asserts authority to do so under section 404(a) of the Federal Aviation Act of 1958 (the Act),[2] which requires carriers to "provide safe and adequate service" and "to establish, observe, and enforce just and reasonable classifications, rules, regulations and practices." The Board has primary responsibility for enforcing these requirements.[3] Smoking regulations promulgated by the Board are set forth in 14 C.F.R. Part 252 (1982).
 
 
 3
 In 1976, ASH petitioned the Board to strengthen its smoking regulations. The Board responded with a notice of proposed rulemaking, ERD-306,[4] which drew thousands of letters from private individuals and comments from various industries, public interest groups, and government agencies. In January 1979, the Board adopted ER-1091, increasing protections for nonsmoking passengers.[5] Five months later, the Board adopted ER-1124, which for the first time applied the smoking regulations to commuter airlines with a passenger capacity of more than 30.[6]
 
 
 4
 ASH sought review of ER-1091 and ER-1124 in this court,[7] arguing that the new regulations still did not provide sufficient protections. We stayed action in that challenge on the Board's assurance that it was proceeding "with dispatch" in its consideration of more stringent smoking regulations proposed in another rulemaking, EDR-377.[8] The Board issued two more proposals, EDR 399 and 420, before taking final action on EDR-377. EDR-399 proposed the so-called "five-minute rule," which would permit airlines to deny seats in the no-smoking section to passengers not present for boarding at least five minutes before scheduled flight departure.[9] EDR-420 further expanded the scope of the rulemaking to include the polar alternatives of banning smoking altogether or revoking the regulations entirely.[10] The Board received voluminous comments from ASH and other groups on each of the proposals.
 
 
 5
 On June 25, 1981, the Board met in open session under the "Sunshine Act."[11] At the meeting, the Board had only two proposals before it. The first, by the Office of Economic Analysis, recommended that the Board rescind all rules relating to smoking aboard aircraft. The second, by the Bureau of Consumer Protection, recommended keeping the no-smoking section requirement, but only guaranteeing seats in that section to passengers meeting whatever check-in requirement the airline imposed. The second proposal also eliminated protections related to pipe and cigar smoke, drifting tobacco smoke, and adequate ventilation. The Board adopted the second proposal in ER-1245[12] on September 2, 1981.
 
 
 6
 ASH attacks promulgation of ER-1245, arguing that (1) the Board's statement of the basis and purpose for rescinding several existing protections for non-smokers was inadequate, and (2) the Board did not sufficiently articulate the basis of its failure to adopt several of the proposed protections for non-smokers.[13] An additional challenge, presented by the intervenors, presents the threshold question whether the Board has authority to regulate smoking at all.
 
 II. BOARD AUTHORITY TO REGULATE SMOKING
 
 7
 "Where the empowering provision of a statute states simply that the agency may 'make ... such rules and regulations as may be necessary to carry out the provisions of this Act' ... the validity of a regulation promulgated thereunder will be sustained so long as it is 'reasonably related to the purposes of the enabling legislation.' "[14] Because the Board has broad rulemaking authority under the Act,[15] its regulations are valid so long as they reasonably advance the purposes of the Federal Aviation Act. For authority to regulate smoking, the Board relies on its responsibility to insure that carriers both "provide safe and adequate service"[16] and observe "just and reasonable ... practices."[17] Because these two requirements differ somewhat in their applicability,[18] we consider them separately.
 
 
 8
 A. "Adequate Service"
 
 
 9
 While the present case was pending, the Fifth Circuit held that the "adequate service" provision of section 404(a)(1) of the Act provides Board authority to regulate smoking.[19] According to the intervenors, that interpretation of the Act is incorrect because Congress intended to commit only economic regulation to the Board, and to leave details of passenger comfort to the absolute discretion of each airline. We disagree.
 
 
 10
 The phrase "adequate service" is not defined by statute, nor is there any specific reference to its meaning in the Act's legislative history. The historical context of the Board's creation, however, supports a broad interpretation of the Board's regulatory authority.[20] Congress established the Board in response to chaos in the industry during the 1930's,[21] which had resulted primarily from economic instability and fierce competition.[22] In 1934, Congress established the Federal Aviation Commission to provide "recommendations of a broad policy covering all phases of aviation and the relation of the United States thereto."[23]
 
 
 11
 The Commission envisioned the creation of an agency with broad power to regulate both the quality and quantity of service provided by carriers.[24] Its report recommended that "[c]ertificates of convenience and necessity should be issued under proper safeguards and specifications. Provision should be made to specify a minimum quality of service and a minimum frequency of schedule on airlines."[25] The Commission recognized, however, that some competition would improve the service offered.[26] Accordingly, it suggested that Congress articulate a general desire for both regulation and competition, and entrust the new agency to strike the proper balance between them.[27]
 
 
 12
 Congress appears to have followed that suggestion. In instructing the Board to regulate in the public interest, it directed the Board to consider both "[t]he promotion of adequate ... service" and "[c]ompetition to the extent necessary to assure the sound development of an air-transportation system...."[28] Thus, it appears that Congress gave the Board authority to determine minimum quality standards when balancing the need for regulation against the benefits of competition.
 
 
 13
 Board authority to regulate quality of service does not conflict with section 401(e)(4) of the Act,[29] which provides that certificates issued by the Board may not "restrict the right of an air carrier to add to or change schedules, equipment, accommodations, and facilities for performing the authorized transportation and service as the development of the business ... shall require ...." On its face, this provision admittedly seems to preclude regulation of quality of service by the Board. But that interpretation proves too much, for it is clear that the Act authorized the Board to regulate several aspects of airline service that such an interpretation would prohibit.[30] Thus, the section cannot be taken as an "absolute restriction on actions the Board may take to further other statutory goals."[31] Instead, the provision gives guidance in evaluating whether a particular regulation ignores the congressional desire for competition.[32] It makes clear that the Board cannot require agency approval of every change in an airline's service consistent with that already certified. The section does not, however, prohibit Board regulation of quality of service.
 
 
 14
 Our interpretation of the interplay of sections 401(e)(4) and 404(a) is supported by interpretations of analogous provisions of the Motor Carrier Act of 1935,[33] after which Congress modeled the Federal Aviation Act.[34] The Motor Carrier Act authorizes the Interstate Commerce Commission (ICC) to require carriers to provide adequate service: that authority enables the ICC to specify the "quality of service" that a carrier must provide.[35] The Motor Carrier Act's analogue to section 401(e)(4) of the Act does not, moreover, severely impair that authority. Congress added that section to the Motor Carrier Act to allay fears that certification procedures would thwart the "natural growth of operations."[36] Thus, the provision assured that certified carriers would not have to reapply to the ICC every time they sought to expand or change the details of their business. Given the marked similarities of the Motor Carrier Act and the Federal Aviation Act, we would need specific justification to interpret the two Acts' analogous provisions differently. No such justification exists here.
 
 
 15
 Finally, the Airline Deregulation Act of 1978, Pub.L. No. 95-504, did not diminish the Board's authority to regulate smoking. To the contrary, although that Act deleted most of section 404, it specifically retained the portion relied upon by the Board to regulate smoking.[37] Legislative history indicates that the desired reform was not aimed at regulation of quality of service, but at the certification procedure that had retarded entry into the industry, expansion of service, and competition over fares.[38] There is absolutely no indication of congressional intent to remove the Board's authority to regulate smoking. Thus, although the Deregulation Act reflected a congressional desire to rely more heavily on competition, it did not disturb Board authority to regulate quality of service.
 
 
 16
 B. Just and Reasonable Classifications, Rules, Regulations and Practices
 
 
 17
 The adequate service requirement of 404(a)(1) does not apply to air carriers in foreign air transportation and therefore cannot provide Board authority to regulate smoking on such transportation. For such authority, the Board relies on section 404(a)(2), which requires air carriers in foreign air transportation to follow "just and reasonable classifications, rules, regulations and practices."[39]
 
 
 18
 This statutory provision is a tenuous source for Board authority to regulate smoking. Congress enacted the provision in 1972 to protect American air carriers from the cut-throat competition of foreign air carriers receiving subsidies from their governments. Legislative history strongly suggests that Congress meant the provision to apply only to regulations affecting fares and other economic matters.[40] Moreover, because the Board was not regulating smoking at all when Congress enacted the section, it is unlikely that Congress intended the section to provide the Board broader authority to do so. Had the Board's authority been challenged when the Board initially regulated smoking, we would have had serious doubts about the Board's authority to regulate smoking on foreign air transportation.
 
 
 19
 For nine years, however, the Board has interpreted the provision to provide that authority. We assume that Congress was fully aware of Board practices concerning smoking when it passed the Airline Deregulation Act. It would be inappropriate to overturn an interpretation that Congress has acquiesced in for nine years, during which it has closely reviewed the statutory scheme under question. As the Supreme Court has said:
 
 
 20
 In addition to the importance of legislative history, a court may accord great weight to the long-standing interpretation placed on a statute by an agency charged with its administration. This is especially so where Congress has re-enacted the statute without pertinent change. In these circumstances, congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress.[41]
 
 
 21
 It follows that the Board has authority to regulate smoking in interstate, overseas, and foreign air transportation. We turn to consider whether the promulgation of ER-1245 was valid.
 
 III. REGULATION ER-1245
 A. Standard of Review
 
 22
 The Board promulgated ER-1245 pursuant to the notice and comment rulemaking procedure prescribed by Sec. 553 of the Administrative Procedure Act.[42] Accordingly, the Board must furnish a basis and purpose statement that complies with the requirements of Sec. 553(c) as interpreted and applied by the courts. The "purpose of requiring a statement of the basis and purpose is to enable courts, which have the duty to exercise review, to be aware of the legal and factual framework underlying the agency's action."[43] An agency need not respond to every comment, but it must "respond in a reasoned manner to the comments received, to explain how the agency resolved any significant problems raised by the comments, and to show how that resolution led the agency to the ultimate rule.... The basis and purpose statement is inextricably intertwined with the receipt of comments."[44] Thus, while the standard for review is whether the agency acted in an arbitrary or capricious manner,[45] the detail required in a statement of basis and purpose depends on the subject of regulation and the nature of the comments received.
 
 B. Partial Rescission of Part 252
 
 23
 An agency's obligation to explain its actions is not reduced when it rescinds rather than promulgates a regulation. The APA clearly contemplates judicial review of agency rescission of a regulation.[46] Moreover, rescission typically involves promulgation of a new regulation rescinding the old one. The new regulation changes the legal rights of interested parties and is reviewable in the same manner as earlier regulations on that subject.[47] The statement of basis and purpose must address, with some precision, the major comments received and, of course, explain why the old regulation is no longer desirable. These requirements do not prevent an agency from altering its course when circumstances or attitudes shift: they merely ensure that those changes reflect reasoned consideration of competing objectives and alternatives.
 
 
 24
 ER-1245 rescinded, inter alia, the following three provisions of Part 252: the requirement of special segregation of cigar and pipe smokers, the ban on smoking when ventilation systems are not fully functioning, and the protections given to nonsmokers against the burdens of breathing drifting smoke.[48] The Board's sole explanation of its action consisted of the following short paragraph:
 
 
 25
 After considering the outstanding proposals and reviewing the existing provisions, we have decided to replace the current rule with a less detailed regulation. In our view, carriers should still be required to provide separate seating for nonsmokers, but should be free to decide most other aspects of inflight smoking, policy. Decisions regarding the minimum size of the no-smoking section, pipe and cigar smoking, and banning smoking when the air conditioning system is not operating are therefore left to carrier discretion under the new rule. References to the burden of breathing smoke (former Sec. 252.2) and sandwiching (former Sec. 252.2(e)) have also been removed.[49]
 
 
 26
 On its face, this explanation is palpably inadequate. The agency offers no reasoning to support its conclusion that the matters covered by the rescinded provisions are better "left to carrier discretion."[50] We are told that the decision was made "[a]fter considering the outstanding proposals," yet no evidence of that consideration is given. To accept the Board's action would render judicial review of informal rules meaningless.
 
 
 27
 The Board defends the stark absence of explanation by downplaying the status of the rescinded regulation. It characterizes the earlier rule, ER-1091, as "an interim decision in an extended consideration of smoking policy."[51] By describing the decision in that way, the Board claims that it needs to provide only minimal explanation for rescinding the rule. That argument is seriously flawed, however, for it ignores ER-1091's status as final agency action following extensive notice and comment rulemaking. The fact that the Board has considered additional smoking protections is of little consequence. The Board has intolerably ignored its responsibility to explain its action. We therefore vacate that portion of ER-1245 which rescinded protections provided in ER-1091.
 
 C. Rejection of Proposed Rules
 
 28
 In addition to rescinding several aspects of part 252, ER-1245 rejected several proposed regulations. Among them was a ban on smoking on small aircraft, a ban on smoking on short flights, and a requirement that airlines provide special protections for persons unusually susceptible to ill effects of breathing smoke. ASH contends that the Board failed to provide an adequate statement of basis and purpose for rejecting the proposals. We agree.
 
 
 29
 The Board offers several reasons to justify its minimal discussion of individual proposals. First, the Board claims that even though it did not explicitly discuss each proposal, "there can be little doubt that the Board was aware of the pros and cons of each alternative."[52] Thus, the Board suggests that as long as the record contains evidence to support its conclusion, it need not explain its action. Precisely the opposite is true. The APA guarantees the public an opportunity to comment on proposed rules. That opportunity "is meaningless unless the agency responds to significant points raised by the public."[53] The need for discussion is paramount precisely because evidence was presented in support of, and in opposition to, most of the proposals. In order to uphold the agency's action, it must be shown that the Board rationally considered the relevant evidence.
 
 
 30
 Second, the Board argues that the specific proposals supported by ASH "are not matters of policy, but alternative means of implementing a policy the Board rejected." Because the Board decided "to impose only a bare minimum of government control," it claims it need not discuss more interventionist alternatives. That argument is specious: ER-1245 not only considered whether to regulate smoking, it also determined an appropriate degree of regulation. A general desire for a bare minimum of regulation cannot justify rejecting specific regulatory proposals. The Board must explain why a particular proposal is inconsistent with the balance between regulation and competition sought by the Board.
 
 
 31
 Finally, the Board's assertion that its decision was necessary to obtain support of a majority of Commissioners is patently irrelevant.
 
 
 32
 1. Special protections for persons especially sensitive to smoke
 
 
 33
 EDR-377 proposed a requirement that airlines provide special accommodations for persons who are unusually susceptible to physical ill-effects from breathing tobacco smoke. This proposal aimed to protect persons with respiratory, cardiovascular and other health conditions, for whom proximity to smoke is a significant health hazard. Although the Board requested and received practical suggestions from commenters concerning eligibility for such accommodations, it offered no explanation for its rejection of the proposal.
 
 
 34
 The Board's only consideration of the health effects of smoking related to a proposed total ban on smoking. The Board found that "[t]he evidence of a link between 'passive smoking' and cancer is ... slight and controversial,"[54] and concluded that a total ban on smoking would be inappropriate. That consideration does not, however, justify rejection of the proposed protections for passengers with special health conditions. Health hazards of passive smoking are presumably much greater for people with conditions such as emphysema than for normally healthy persons:[55] The Board recognized that fact when it proposed the special protections. It follows that the Board's failure to address those serious health concerns is arbitrary and capricious.
 
 2. Ban on smoking on small aircraft
 
 35
 EDR-377 also proposed a rule to ban all smoking on aircraft with thirty seats or less. The rationale for such a ban is that segregation of smokers on a small plane is not feasible and that small planes are generally used for short flights in which a ban would be less objectionable to smokers. The Board received considerable comments on that proposal, including favorable comments by two airlines that had instituted such a ban on their own initiative.[56]
 
 
 36
 Nevertheless, the Board offered no reasons for its rejection of the proposal. Instead, its discussion focused on the need to resolve the unequal application of the smoking regulations as between certificated air carriers and commuters. Prior to ER-1245, smoking regulations applied to all certificated air carriers, but only to commuter air carriers in the operation of aircraft of over thirty seats. The Airline Deregulation Act blurred the distinction between those two types of operators, making the disparate treatment seem unfair. To equalize the regulatory burden on commuters and certificated air carriers, the Board exempted all aircraft with fewer than thirty seats from the smoking regulations.
 
 
 37
 Thus, the Board explained why commuters and certificated air carriers should be regulated similarly. It offered no reasons, however, for why the regulations should not include a total ban on smoking in small aircraft. Such a ban would avoid the difficulties of segregating smokers on a small plane, which were presumably the basis for the original decision not to regulate smoking on commuter flights. It is certainly not obvious on its face, therefore, why such a ban would create the sort of complicated regulatory burden that the Board seeks to eliminate.
 
 3. Ban on smoking on short flights
 
 38
 EDR-377 also proposed a smoking ban on flights of less than one hour. The rationale for that rule is that it would better protect nonsmokers' interests at little inconvenience to smokers. Several health groups commented in favor of the proposal, and industry commented in opposition to it.[57]
 
 
 39
 In ER-1245 the proposal received no attention whatsoever. Such treatment plainly disregards the agency's obligation to respond to the major comments received in rulemaking.[58]
 
 CONCLUSION
 
 40
 To summarize, the authority of the Board to regulate smoking on interstate, overseas and foreign transportation is affirmed; the portion of ER-1245 that rescinded the protections of nonsmokers provided by ER-1091 is vacated; and finally, the three proposals in EDR-377 that the Board disposed of without reasons are remanded for further proceedings.
 
 
 41
 So ordered.
 
 
 
 [1]
 The Board first proposed rules in response to a petition for rulemaking by Ralph Nader. EDR-231, 37 Fed.Reg. 19146 (Sept. 13, 1972). The resulting rule, ER-800, 38 Fed.Reg. 12207 (May 10, 1973), required air carriers to provide a no-smoking section for each class of service
 
 
 [2]
 As amended, 49 U.S.C. Sec. 1374(a) (1976)
 
 
 [3]
 Section 1002(b), (c); 49 U.S.C. Sec. 1482(b)
 
 
 [4]
 41 Fed.Reg. 44424 (Oct. 8, 1976)
 
 
 [5]
 44 Fed.Reg. 5075 (Jan. 25, 1979). ER-1091 provided nonsmokers three new protections: first, it required special segregation of cigar and pipe smokers; second, it clarified existing regulations to require that no-smoking sections accommodate all passengers desiring a seat in them; and third, it prohibited all smoking when ventilation systems were not functioning fully
 
 
 [6]
 44 Fed.Reg. 30083 (May 24, 1979)
 
 
 [7]
 ASH v. CAB, Nos. 79-1044, 79-1095, and 79-1754
 
 
 [8]
 44 Fed.Reg. 29486 (May 21, 1979)
 
 
 [9]
 45 Fed.Reg. 26976 (Apr. 22, 1980)
 
 
 [10]
 46 Fed.Reg. 11827 (Feb. 11, 1981)
 
 
 [11]
 Government in the Sunshine Act, 5 U.S.C. Sec. 552b (1976)
 
 
 [12]
 14 C.F.R. Sec. 252 (1982)
 
 
 [13]
 The portions of ER-1245 which adopted the late arrival rule (14 C.F.R. Sec. 252.2), rejected a proposed total smoking ban, and rejected a proposed revocation of all smoking regulations are not challenged, and are therefore not in issue here
 
 
 [14]
 Mourning v. Family Publications Serv., Inc., 411 U.S. 356, 369, 93 S.Ct. 1652, 1660-1661, 36 L.Ed.2d 318 (1973) (footnote omitted) (quoting Thorpe v. Housing Auth., 393 U.S. 268, 280-81, 89 S.Ct. 518, 525-526, 21 L.Ed.2d 474 (1969)). See also American Trucking Ass'ns v. United States, 344 U.S. 298, 73 S.Ct. 307, 97 L.Ed. 337 (1953)
 
 
 [15]
 Section 204(a), 49 U.S.C. Sec. 1324(a) (1976). That section gives the Board authority "to make and amend such general or special rules, regulations, and procedure, pursuant to and consistent with the provisions of this chapter, as it shall deem necessary to carry out the provisions of, and to exercise and perform its powers and duties under this chapter."
 
 
 [16]
 49 U.S.C. Sec. 1374(a)(1)
 
 
 [17]
 49 U.S.C. Sec. 1374(a)(2)
 
 
 [18]
 See infra p. 1215
 
 
 [19]
 Diefenthal v. CAB, 681 F.2d 1039 (5th Cir.1982)
 
 
 [20]
 Section 1374(a) of the Federal Aviation Act of 1958 was a "reenactment, virtually without substantive change" of the same section in the Civil Aeronautics Act of 1938. See H.R.REP. NO. 2360, 85th Cong., 2d Sess. 15 (1958), U.S.Code Cong. & Admin.News 1958, p. 3741. Legislative history of the 1938 Act therefore gives primary guidance as to the meaning of the current provision
 
 
 [21]
 See Note, Federal Regulation of Aviation, 60 HARV.L.REV. 1235 (1947)
 
 
 [22]
 See H.R.REP. NO. 2254, 75th Cong., 3d Sess. 2 (1938)
 
 
 [23]
 S.DOC. NO. 15, 74th Cong., 1st Sess. 1 (1935)
 
 
 [24]
 Id. at 39
 
 
 [25]
 Id. at 9
 
 
 [26]
 Id. at 61-62
 
 
 [27]
 Id
 
 
 [28]
 49 U.S.C. Secs. 1302(c), (d) (1976)
 
 
 [29]
 49 U.S.C. Sec. 1371(e)(4) (1976)
 
 
 [30]
 A rigid reading of this provision would emasculate the Board's authority to enforce the safe and adequate service requirement of section 404(a). See Capital Airlines, Inc. v. CAB, 281 F.2d 48, 52 (D.C.Cir.1960). Thus, the "provision must be read in harmony with the rest of the Act." Id
 
 
 [31]
 Continental Air Lines v. CAB, 522 F.2d 107, 116 (D.C.Cir.1974)
 
 
 [32]
 See Diefenthal v. CAB, 681 F.2d 1039 (5th Cir.1982); Continental Air Lines v. CAB, 522 F.2d 107, 116-17 (D.C.Cir.1974)
 
 
 [33]
 49 Stat. 543, Pub.L. 255, 74th Cong. (1935) (current version recodified with minor language changes at 49 U.S.C. Sec. 10101 et seq.). The Motor Carrier Act's analogue to section 401(e)(4) of the Federal Aviation Act is section 208(a), 49 Stat. 552. The analogue to section 404(a) is section 216(a), 49 Stat. 558. The language of the analogous provisions is virtually identical
 
 
 [34]
 Congress's intent with respect to the Motor Carrier Act has previously been recognized as a primary guide for interpreting the Federal Aviation Act. See Transcontinental Bus Sys. v. CAB, 383 F.2d 466, 480 (5th Cir.1967), cert. denied, 390 U.S. 920, 88 S.Ct. 850, 19 L.Ed.2d 979 (1968); Diefenthal v. CAB, 681 F.2d 1039 (5th Cir.1982)
 
 
 [35]
 Crescent Express Lines v. United States, 49 F.Supp. 92 (S.D.N.Y.) (3-judge panel), aff'd, 320 U.S. 401, 64 S.Ct. 167, 88 L.Ed. 127 (1943)
 
 
 [36]
 The bill as drafted by the Federal Coordinator of Transportation did not contain the proviso. S.DOC. NO. 152, 73d Cong., 2d Sess., 47, 357. The addition was explained by Senator Wheeler, the Chairman of the Interstate Commerce Committee, as follows:
 Section 208(a), page 26, as amended, permits the Commission to attach to all certificates, whether granted under the grandfather clause or otherwise, reasonable terms, conditions, and limitations. In order to meet criticisms that the effect of these provisions would be to check the natural growth of operations if every increase in facilities required authorization by the Commission, the committee has amended section 208(a)....
 
 
 [79]
 CONG.REC. 5654 (April 15, 1935)
 
 
 [37]
 See Sec. 1601(a)(2)(B) (codified at 49 U.S.C. Sec. 1551(a)(2)(B) Supp. IV 1980)
 
 
 [38]
 See H.R.REP. NO. 1211, 95th Cong., 2d Sess. 2, reprinted in 1978 U.S.CODE CONG. & AD.NEWS 3737, 3738
 
 
 [39]
 49 U.S.C. Sec. 1374(a)(2) (1976). Section 404(a)(1) also has a "just and reasonable ... practices" provision, which applies to interstate and overseas transportation. We need not consider the significance of that provision because the adequate service provision provides sufficient authority for the Board's smoking regulations covering that transportation
 
 
 [40]
 See H.R.REP. NO. 92-854, 92d Cong., 2d Sess. 5 (1972) ("This legislation is ... strictly limited in its scope and does not pretend to solve all of the ills and problems of international air transportation.")
 
 
 [41]
 NLRB v. Bell Aerospace Co., 416 U.S. 267, 274-75, 94 S.Ct. 1757, 1761-1762, 40 L.Ed.2d 134 (1973) (emphasis added) (footnotes omitted)
 
 
 [42]
 5 U.S.C. Sec. 553 (1976)
 
 
 [43]
 American Standard, Inc. v. United States, 602 F.2d 256, 269 (Ct.Cl.1979). See Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 417, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971) ("the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment")
 
 
 [44]
 Rodway v. U.S. Dep't of Agriculture, 514 F.2d 809, 817 (D.C.Cir.1975) (citations omitted)
 
 
 [45]
 5 U.S.C. Sec. 706(2)(A); Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823-824, 28 L.Ed.2d 136 (1971)
 
 
 [46]
 5 U.S.C. Sec. 706 clearly contemplates judicial review of rulemaking, which is defined as "agency process for formulating, amending, or repealing a rule," id. Sec. 551(5)
 
 
 [47]
 The "substantial impact" test determines the applicability of Sec. 553 procedures essentially by asking whether the agency action carries substantial impact on the rights and interests of private parties. Batterton v. Marshall, 648 F.2d 694, 709 (D.C.Cir.1980); see, e.g., Pickus v. United States Bd. of Parole, 507 F.2d 1107 (D.C.Cir.1974); Lewis-Mota v. Sec'y of Labor, 469 F.2d 478 (2d Cir.1972)
 
 
 [48]
 This third provision was aimed at practices known as "sandwiching", in which a no-smoking section was placed between two smoking sections, or across the aisle from one
 
 
 [49]
 46 Fed.Reg. 45936 (Sept. 16, 1981)
 
 
 [50]
 The Board's action followed the recommendation of the agency's Bureau of Compliance and Consumer Protection. Memorandum of June 12, 1981 (Joint Appendix 336). That memorandum also gave no reasoning for the recommended action concerning cigar and pipe smoke and inadequate ventilation
 
 
 [51]
 Brief at 33
 
 
 [52]
 Brief at 32
 
 
 [53]
 Alabama Power Co. v. Costle, 636 F.2d 323, 384 (D.C.Cir.1979)
 
 
 [54]
 46 Fed.Reg. 45936 (Sept. 16, 1981)
 
 
 [55]
 For example, Secretary of Health and Human Services Richard Schweiker stressed the importance of protecting sensitive individuals from the effects of passive smoking in a letter to the Chairman of the Board dated May 13, 1981. The Secretary summed up his letter by saying that: "In short, involuntary or passive smoking is ... a health risk to persons with existing respiratory, cardiovascular and other disabilities." The previous Secretary of the Department of Health, Education, and Welfare had expressed similar concerns in letters to the Board. 44 Fed.Reg. 29487 (May 21, 1979). See also Hirayama, Non-Smoking Wives of Heavy Smokers Have a Higher Risk of Lung Cancer: A Study from Japan, BRIT.MED.J. (January 17, 1981); Repace & Lowry, Indoor Air Pollution, Tobacco Smoke, and Public Health, SCIENCE (May 2, 1980); White and Froeb, Small-Airways Dysfunction in Nonsmokers Chronically Exposed to Tobacco Smoke, NEW ENG.J. MEDICINE (March 27, 1980)
 
 
 [56]
 See Memorandum from Richard Dyson, FAA Associate General Counsel, to the Board (May 6, 1981) (Joint Appendix 225, 228-29), summarizing comments on EDR-377
 
 
 [57]
 Id
 
 
 [58]
 Alabama Power Co. v. Costle, 636 F.2d 323, 384 (D.C.Cir.1979)