Dr. Zinovy V. REYTBLATT and Ohio
Citizens For Responsible Energy,
Petitioners,

v.

UNITED STATES NUCLEAR REGULA-
TORY COMMISSION, and The United
States of America, Respondents,

Nuclear Energy Institute, Intervenor.

No. 95–1578.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 25, 1996.

Decided Feb. 7, 1997.

Rehearing Denied April 10, 1997.

Kimberley K. Walley, Washington, DC, with whom Eric R. Glitzenstein was on the briefs, argued the cause for petitioners.

Grace H. Kim, Attorney, U.S. Nuclear Regulatory Commission ("NRC" or "Commission"), Washington, DC, with whom Karen D. Cyr, General Counsel, Washington, DC, John F. Cordes, Jr., Solicitor, and E. Leo Slaggie, Deputy Solicitor, NRC, Rockville, MD, and Jonathan F. Klein, Attorney, U.S. Department of Justice, Washington, DC, were on the brief, argued the cause for respondents. Roger K. Davis, Senior Attorney, NRC, Washington, DC, entered an appearance.

Daniel F. Stenger, Washington, DC, with whom Robert L. Draper, Nicholas S. Reynolds, and Robert W. Bishop were on the brief, argued the cause for intervenor.

Before EDWARDS, Chief Judge, WALD, Circuit Judge, and BUCKLEY, Senior Circuit Judge.

Opinion for the court filed by Senior Judge BUCKLEY.

BUCKLEY, Senior Judge:

Petitioners Dr. Zinovy Reytblatt and Ohio Citizens for Responsible Energy challenge the Nuclear Regulatory Commission's final rule amending the reporting requirements for performance-based containment leakage rate testing by nuclear power plants. Their primary contention is that the Commission acted arbitrarily and capriciously in failing to respond adequately to Dr. Reytblatt's comments. Because we find the Commission's response to be adequate, we deny the petition for review.

## I. BACKGROUND

All nuclear power plants licensed in the United States must have a protective shielding structure, commonly called the "containment," which houses the nuclear reactor and its associated parts. If an accident damages the reactor, the containment is intended to confine the gaseous radioactive material that

would otherwise be released into the environment. The Nuclear Regulatory Commission ("NRC" or "Commission") has issued rules governing the permissible rate of leakage from these containment systems and requiring periodic leakage rate tests. These are contained in Appendix J to the Commission's regulations. *See generally* 10 C.F.R. pt. 50 App. J (1996).

## A. Appendix J's Testing Requirements

· Prior to September 1995, Appendix J incorporated a "prescriptive approach" to the testing of containment leakage rates. Regulations implementing this approach specified the types of tests that were acceptable, the manner in which they were to be conducted, their frequency, and how they were to be reported. *See* 10 C.F.R. at 757–61.

The amendments to Appendix J adopted in September 1995 ("September Rule") gave licensees the option of adopting a "performance-based" approach to containment leakage rate testing as an alternative to compliance with the prescriptive requirements. *See id.* at 756, 761–63; *Primary Reactor Containment Leakage Testing for Water-Cooled Power Reactors,* 60 Fed.Reg. 49,495, 49,495 (1995). Under this approach, the frequency of leakage rate testing is not specified but is determined by the results of prior tests. 10 C.F.R. at 762.

## B. Appendix J's Reporting Requirements

### 1. Reporting Requirements Under the Prescriptive Approach

Under the original prescriptive program, licensees were required to file a summary report of the results of all leakage rate tests, regardless of whether the licensee believed that the plant had failed or passed the test. 10 C.F.R. at 764 (1995). These reports were kept in the NRC's Public Document Room, *id.* § 9.21(b), and made available to the public pursuant to the Freedom of Information Act ("FOIA"). *Id.* § 9.11.

In March 1995, the NRC issued a final rule ("March Rule") that reduced the reporting requirements under the prescriptive program. *Reduction of Reporting Requirements Imposed on NRC Licensees,* 60 Fed.

Reg. 13,615, 13,615 (1995) (codified at 10 C.F.R. pt. 50 App. J). Although, under the new rule, licensees were still obliged to prepare summary reports for all leakage rate test results and to make them available for the NRC's review and inspection at the respective plant sites, they were only required to file the reports of failed tests to the NRC. *Id.* at 13,615, 13,617. Therefore, only reports for failed tests were available for public inspection.

In the preamble to the March Rule, the NRC explained that, in determining whether to eliminate a reporting requirement, it

> first consider[ed] the public health and safety impact of the proposed elimination [and if] there [was] no direct impact on public health and safety, [it] also consider[ed] the reduced administrative burden on the licensee and the extent to which the proposed elimination [would] deprive the public of important health and safety information.

*Id.* at 13,615. The Commission concluded that limiting the filing requirements to reports of failed leakage rate tests would reduce the regulatory burden on licensees without adversely affecting the public health and safety. *Id.* All seven parties commenting on the proposed rule agreed with this conclusion. *Id.*

Dr. Reytblatt did not comment on the March Rule. Ohio Citizens for Responsible Energy ("OCRE"), however, filed a timely objection to the proposed modification of reporting requirements on the ground that it would diminish the public's access to information necessary for public participation in the regulatory process. *Id.* The NRC responded by referring to a previous OCRE petition that sought to establish a public right-to-know provision that would ensure public access to information held by licensees. That petition addressed the cumulative effect of various rulemakings that deprived the public of access to information previously available through the NRC. *Id.* at 13,615–16. The Commission concluded that OCRE's comments on the March Rule raised a "generic issue [that was] better addressed in the context of [the earlier] petition." *Id.* at 13,-616. It also found that "the loss of informa-

tion in this particular case [would] not adversely affect the public interest in access to information regarding adequate protection of the public health and safety." *Id.*

### 2. Reporting Requirements Under the Performance-Based Approach

The September Rule provided licensees with a performance-based option whose reporting requirements were essentially identical to those previously adopted under the March Rule for the prescriptive approach. Thus, under the September Rule, licensees must make successful performance-based test results available to the NRC for inspection at plant sites. 60 Fed.Reg. at 49,505. If a containment system fails to meet its performance criteria, however, a report of the test results must be filed with the Commission pursuant to the "Emergency Notification System" provisions of 10 C.F.R. §§ 50.72(b)(1)(ii), 50.72(b)(2)(i), and 50.73(a)(2)(ii). *Id.*

The performance-based rule was proposed in a February 1995 notice in the Federal Register that established a 75-day comment period. *Primary Reactor Containment Leakage Testing for Water-Cooled Power Reactors,* 60 Fed.Reg. 9634, 9634 (proposed Feb. 21, 1995). The NRC "assure[d] consideration only for comments received on or before [the May 8, 1995 deadline]," and indicated that those received after the deadline would be considered to the extent "practical." *Id.* Although the NRC received numerous comments on the technical aspects of the proposed rule, the only timely comment that mentioned the reporting requirements was contained in a letter dated May 4, 1995, from Dr. Reytblatt, an expert in nuclear reactor containment leakage rate testing who frequently commented on NRC proposals involving that subject. *See* 60 Fed.Reg. at 49,503.

In his seventeen-page submission regarding the September Rule, Dr. Reytblatt focused primarily on methodologies for conducting and analyzing leakage rate test results. Nevertheless, at five places he expressed a general concern regarding the reporting requirements under the performance-based option. The following ex-

cerpts from Addendum 1 to his comments describe both the nature of his concern and specific proposals for making test information available to the public:

> What the Standard [a reference to a guideline proposed by an industry group, American National Standards Institute ("ANSI"), that the Commission had not adopted] proposes to submit to NRC is just a cover letter.

> Section 5.11 is written with the clear intent to conceal from the public all essential information about a test.

> Section 5.11.2 is vague and unclear and contains no defined requirements. The idea of fair analysis without any public access is preposterous.

> The adequate requirement would be to hold a short, announced well ahead of time, seminar similar to a public hearing where utility analysts and consultants would have an opportunity to expose the test to their colleagues and to the public.

> Section 5.12.2 does not require retaining of computer programs controlling the test. It is written with a malicious intent to preclude [the] public from accessing the test data and processing thereof by filing FOIA requests to NRC. There is no essential propriet[a]ry information involved with this matter contrary to the industry position, and if there is, then specific petitions may be filed for exemptions.

> I propose that all Sections of the Standard concerned with reporting be replaced with one short requirement that all computer files pertaining to testing be submitted in a real-time mode to the NRC for permanent storage to prevent their alteration or destruction. This is the cheapest and technologically perfect way of reporting. It also puts an end to all attempts to deprive [the] public from information vital to [its] safety. This proposal is so important that it merits presentation for consideration to the United States Government.

Addendum 1 to comments on App. J. to 10 C.F.R. Part 50, NUREG–1493 & ANSI/ANS 56.8–94, by Dr. Zinovy Reytblatt, dated May 4, 1995, *reprinted in* Joint Appendix ("JA") at 398–99.

The test reporting is reduced to a cover letter to prevent the American people from obtaining [ ] complete test data through FOIA. All test computer programs, calculations and files must be copied in real-time mode and deposited with the NRC. This is the most inexpensive and technically perfect way to secure an instant access to the test data.

*Id.* at 401 ¶ 7.

On July 7, 1995, the NRC sent Dr. Reytblatt a copy of its *Public Comment Resolution, reprinted in* JA at 410–43. In this document, the Commission responded to 26 letters addressing the proposed rule, including Dr. Reytblatt's May 4 submission. In a section entitled "Reporting Requirements," the Commission stated:

97. Only one comment was received on this issue. Dr. Z. Reytblatt noted that the proposed rule's reporting requirements consist only of a cover letter to the NRC, and suggested this is intended to conceal information from the public. It was suggested that a public hearing, in which utility analysts present the results of their tests to the general public, would constitute an adequate reporting requirement. Moreover, Dr. Reytblatt suggests that utilities should be required to submit all computer files related to testing to the NRC immediately after the tests have been completed to prevent their alteration or destruction. Dr. Reytblatt believes such brief reporting would not seem to be burdensome, does not add any additional costs, and will be extremely useful for any public member who is doing independent research in the field of leak rate testing to the public benefit.

*NRC Response:* ·

98. It is not the intent of the NRC's reporting requirements to conceal information from the public; if tests fail, the information is required to be reported to the NRC, and the NRC will make such data available to the public. The NRC believes that its on-site inspections of Appendix J tests and the requirements to make such data accessible to the NRC provides adequate assurance of the integrity of the test data.

*NRC Disposition*

99. The NRC has decided, based on consideration of this public comment, to retain its reporting requirements as stated in the proposed rule.

*Id.* at 438–39 (irregular margins in original). The NRC summarized paragraphs 98 and 99 of the *Public Comment Resolution* in the preamble to the September Rule. 60 Fed. Reg. at 49,503.

On July 28, 1995, two months after the deadline for comments had passed, Dr. Reytblatt wrote a second letter to the NRC addressing the *Public Comment Resolution,* to which the NRC did not respond. OCRE, on the other hand, filed timely comments to the September Rule; but these did not deal with the reporting requirements for performance-based testing.

In this proceeding, petitioners do not challenge either the testing requirements of the performance-based option or the testing or reporting requirements under the prescriptive approach. They only question the reporting requirements under the performance-based option.

## II. DISCUSSION

### A. Standing

■ As an initial matter, we must address the Commission's challenge to petitioners' standing. The Hobbs Act gives this court jurisdiction to review final NRC rules dealing with the activities of licensees, but provides that only "part[ies] aggrieved" by such rules may petition a court of appeals for review. 28 U.S.C. § 2344 (1994). Thus, the Hobbs Act requires (1) "party" status (i.e., that petitioners participated in the proceeding before the agency), *Water Transp. Ass'n v. ICC,* 819 F.2d 1189, 1192–93 (D.C.Cir.1987), and (2) aggrievement (i.e., that they meet the requirements of constitutional and prudential standing). *Id.* at 1193–94.

■ Petitioners clearly meet the first condition because each participated in the Commission's informal rulemaking by filing comments on the proposed rule. It is true, as

intervenor Nuclear Energy Institute points out, that OCRE did not address the new reporting requirements in its comments; but because Dr. Reytblatt did so in his letter of May 4, 1995, OCRE is at liberty to raise the same argument in its petition. *See, e.g., Cellnet Communication, Inc. v. FCC*, 965 F.2d 1106, 1109 (D.C.Cir.1992) ("Consideration of the issue by the agency at the behest of another party is enough to preserve it.") Accordingly, we address, in turn, petitioners' constitutional and prudential standing.

### 1. Constitutional Standing

■ Article III of the Constitution requires a showing (1) that petitioners have suffered an actual or imminent injury that is concrete and particularized, (2) that the injury is fairly traceable to the challenged action, and (3) that it is likely to be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136–37, 119 L.Ed.2d 351 (1992) (internal quotation marks and citations omitted).

■ Petitioners meet the first of those requirements because the September Rule's restriction on their access to leakage rate testing data makes it more difficult for them to determine whether they have a basis for filing a petition pursuant to 10 C.F.R. § 2.206(a). Section 2.206 entitles any member of the public to "file a request to institute a proceeding ... to modify, suspend, or revoke a license, or for such other action as may be proper." *Id.* In the past, petitioners have filed several section 2.206 petitions based on public information regarding nuclear plant test results, one of which resulted in the NRC's discovery of discrepancies in a licensee's leakage tests that, in turn, led to a two-month shutdown of its plant.

■ The NRC suggests that the causation and redressability requirements have not been met because it was the March Rule that eliminated the more stringent reporting requirements for all leakage rate tests. According to the Commission, because the September Rule added no restrictions on public access to test records beyond those then in existence, vacatur of the September Rule could not give petitioners the relief they seek, i.e., reinstatement of the more strin-

gent reporting requirements that existed prior to the March Rule.

We find this contention unpersuasive. The March Rule addressed only the reporting requirements for the prescriptive option because the performance-based option had not yet been adopted by the NRC. Although petitioners were unaware of the March Rule when they filed their initial brief in this court, there is no question that their challenge was always limited to the reporting requirements under the performance-based option. Furthermore, the relief they seek— vacatur of the September Rule—could remedy their injury by requiring the NRC to undertake a new rulemaking with respect to reporting under the performance-based option which, in turn, would enable petitioners to argue the propriety of more stringent reporting requirements under the performance-based option.

### 2. Prudential Standing

■ Petitioners also satisfy the requirements of prudential standing: The relevant inquiry in this context is whether the injury is arguably within the zone of interests to be protected or regulated by the statute in question. *Scheduled Airlines Traffic Offices, Inc. v. Department of Defense*, 87 F.3d 1356, 1359 (D.C.Cir.1996) (quoting *Association of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 829–30, 25 L.Ed.2d 184 (1970)). Because petitioners are not licensees, they are not "regulated" by the Atomic Energy Act. Thus, they must show that they are arguably "protected" by the statute by demonstrating that they are either its intended beneficiaries or "suitable challengers" to enforce the statute, i.e., persons whose "interests are sufficiently congruent with those of the intended beneficiaries that the litigants are not more likely to frustrate than to further the statutory objectives." *First Nat'l Bank & Trust Co. v. National Credit Union Admin.*, 988 F.2d 1272, 1275 (D.C.Cir.1993) (internal quotation marks and citation omitted).

We find that Dr. Reytblatt and OCRE fall within the zone of interests protected by the statute. The Atomic Energy Act, 42 U.S.C.

§ 2011 *et seq.* ("Act"), authorizes the NRC to regulate the use of nuclear material and atomic energy in order to "protect the health and safety of the public." 42 U.S.C. § 2012(d), (e); *see also id.* § 2012(i). To this end, the Act encourages public participation in the administrative process. Thus it requires the NRC to grant a hearing upon request and admit as a party any person whose interest may be affected by a proceeding

> for the granting, suspending, revoking, or amending of any license or construction permit, or application to transfer control, and in any proceeding for the issuance or modification of rules and regulations dealing with the activities of licensees[.]

*Id.* § 2239(a)(1)(A). Similarly, the Commission's regulations create a process whereby any member of the public may file a request "to modify, suspend, or revoke a license, or for such other action as may be proper." 10 C.F.R. § 2.206(a). Because Dr. Reytblatt and OCRE arguably need access to information relating to successful as well as failed tests in order to exercise their rights under these provisions, they meet the requirements for prudential standing.

## B. The Merits

■ Under the Administrative Procedure Act ("APA"), the September Rule must be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1994). "When an agency rule is challenged as arbitrary and capricious, the scope of judicial review is narrow. Courts may not substitute their judgment for that of the agency." *Western Coal Traffic League v. United States*, 677 F.2d 915, 927 (D.C.Cir.1982) (citations omitted). "But ... courts must assure that the agency has provided a reasoned explanation for its rule." *Id.*

■ Section 553 of the APA requires an agency, after notice and comment on a proposed rule, to "incorporate in the rules adopted a concise general statement of their basis and purpose." 5 U.S.C. § 553(c) (1994). Thus, "[t]he basis and purpose statement is inextricably intertwined with the receipt of comments." *Action on Smoking and Health v. CAB*, 699 F.2d 1209, 1216 (D.C.Cir. 1983) (internal quotation marks and footnote omitted). An agency need not address every comment, but it must respond in a reasoned manner to those that raise significant problems. *See id.* Nevertheless, "[t]he detail required in a statement of basis and purpose depends on the subject of the regulation and the nature of the comments received." *Id.*

■ Petitioners' primary contention is that the NRC failed to respond adequately to Dr. Reytblatt's concerns about the reporting requirements under the performance-based approach. These concerns, however, were mentioned in the May 4, 1995, letter only in general (and highly abusive) terms. The letter did not explain why the public needed the information or how the reporting requirements would hinder Dr. Reytblatt's ability to file section 2.206 petitions alerting the NRC to possible violations. Indeed, the letter did not even mention that section. Rather, it referred to an irrelevant "Standard" that the NRC had not adopted and did not rely upon in establishing the reporting requirements for the performance-based option. Moreover, the letter failed to mention the reporting requirements under the March Rule and did not explain why the requirements under the performance-based option should differ from those already in effect for the prescriptive option.

Under the circumstances, we find the NRC's response to Dr. Reytblatt's concerns over the reporting rules and his accusation that the NRC had maliciously intended to preclude the public from obtaining access to test data to be entirely adequate. Given his substitution of invective for a reasoned explanation of why he opposed the proposed rule, it was appropriate for the NRC to simply affirm that its intent was not to conceal information from the public, that information concerning failed leakage rate tests would still be made available to the public, and that the combination of on-site inspections and the dissemination of data from failed tests would ensure the integrity of the test data.

■ Although the NRC did not directly respond to Dr. Reytblatt's suggested alternatives to the reporting requirements, which

included holding seminars discussing test data and requiring licensees to submit a computer disk containing test data to the NRC, its explanation was adequate in light of the general nature of Dr. Reytblatt's comments and the fact that the primary focus of the September Rule was the establishment of a new performance-based approach rather than modification of existing reporting requirements. *See Thompson v. Clark,* 741 F.2d 401, 408 (D.C.Cir.1984) (citation omitted) (Section 553(c) of the APA "has never been interpreted to require the agency to respond to every comment, or to analy[z]e every issue or alternative raised by the comments, no matter how insubstantial.").

Petitioners also contend that the NRC erred in failing to address Dr. Reytblatt's July 28, 1995, letter, which he wrote in response to the *Public Comment Resolution.* This second letter specifically raised Dr. Reytblatt's concern that decreasing the amount of testing data available to the public would hinder his ability to review nuclear power plants' compliance with NRC regulations. Although petitioners concede that the letter arrived more than two months after the close of the comment period, they assert that because the Commission represented that it had considered all comments, including those received after the deadline, 60 Fed. Reg. at 49,499, it was somehow obligated to respond to the untimely ones. We have previously determined that "[a]gencies are free to ignore . . . late filings." *Personal Watercraft Indus. Ass'n v. Department of Commerce,* 48 F.3d 540, 543 (D.C.Cir.1995). We see no basis for obliging an agency to specifically address untimely comments merely because it has indicated that it would take them into consideration.

We note that Dr. Reytblatt and OCRE are free to petition the NRC, pursuant to 10 C.F.R. § 2.802, to conduct a new rulemaking that would increase the reporting requirements under both the prescriptive and the performance-based options. OCRE has already filed a separate petition urging the adoption of public right-to-know provisions that would give the public access to documents relevant to NRC-licensed or NRC-regulated activities that are in the possession of licensees and license applicants. *Ohio Citizens for Responsible Energy, Inc.; Receipt of Petition for Rulemaking,* 59 Fed.Reg. 30,-308, 30,309 (1994). The NRC's counsel indicated at oral argument that a draft response is circulating within the agency and is expected to be released shortly. If the NRC grants OCRE's petition, both petitioners will be free to comment on any rule proposed as a consequence.

III. CONCLUSION

Because we find that the NRC did not act arbitrarily or capriciously when it amended Appendix J, the petition for review is

*Denied.*